WALKER v. WALKER.[*]

(Division A. Oct. 26, 1925.)

[105 So. 753. No. 25009.]

1. DIVORCE. *Not obtainable for acts during insanity.*

Divorce on ground of desertion or cruelty may not be obtained from acts occurring during insanity or during period in which offender was judicially determined to be insane, where no effort is made to overturn presumption, raised by adjudication of lunacy proceedings, that she was generally insane.

2. JUDGES. *Not disqualified when not related to parties or financially interested.*

Chancellor properly declines to recuse himself, where neither shown to be related to parties nor financially interested in litigation.

3. DIVORCE. *Under prayer, custody of children or alimony not awarded where divorce cannot be granted.*

Custody of children or alimony cannot be awarded; the prayer therefor being dependent on a decree of divorce which under the facts cannot be granted.

---

*Headnotes 1. Divorce, 19 C. J., Section 170; Confinement in asylum or prison as affecting right to divorce upon the ground of living apart, desertion, or abandonment see notes in 34 L. R. A. 161; 16 L. R. A. (N. S.) 1071, L. R. A. 1918A, 1186; 4 A. L. R. 1333; 9 R. C. L., p. 334, 357; 2 R. C. L. Supp. 786; 4 R. C. L. Supp. 603; 2 Judges, 33 C. J. sections 130, 190; 3. Divorce, 19 C. J., sections 567, 569 (Anno.), 794. Jurisdiction of court to award custody of children after prayer for divorce has been withdrawn or dismissed, see notes in 35 L. R. A. (N. S.) 1159; L. R. A. 1917D, 976; 9 R. C. L., p. 473; 2 R. C. L. Supp., p. 809.

APPEAL from chancery court of Newton county. HON. G. C. TANN, Chancellor.

Bill for divorce by C. C. Walker against Wincie Ann Walker. Decree for complainant, and defendant appeals. Reversed and dismissed.

*Huff & Lee,* for appellant.

I. *The court erred in awarding appellee a divorce.* The two charges laid in the bill of complaint were desertion and cruel and inhuman treatment. It was charged that appellant deserted her husband "about the—day of June, 1921." The bill was sworn to the 18th day of August, 1923, and filed. By a decree of the chancery court, of date June 21, 1922, which decree confirmed the action of the lunacy commission, had the latter part of 1921 or the first part of 1922, the appellant was adjudged insane. If she were insane, then we submit that she could not have been guilty of wilful, continued and

obstinate desertion. And especially, if the court please, since her custody had been awarded to her brother, J. C. Stringfellow. How on earth could appellant be guilty of desertion toward appellee, when her custody had been awarded to some person other than her husband, and when, in legal effect, she was restrained from living with her husband? And besides, she was adjudged to be under disability and was so restrained from living with her husband until the 11th day of August, 1923, when she was restored to sanity.

II. The next proposition set up in the bill was cruel and inhuman treatment, carrying a knife and threatening to kill appellee. Appellee testifies that all of these cruel acts on which he bottoms his prayer for a divorce, on the ground of cruel and inhuman treatment, were committed by appellant at a time, in his opinion, when she was insane. Now, we submit, if the acts testified about by appellee were committed by appellant at a time when she was insane, then such acts could not, in legal effect, constitute cruel and inhuman treatment. See 19 C. J. 76.

We submit, therefore, that this is a case where the chancellor, both on the law and the facts, was manifestly wrong, and that this court should reverse the case.

III. *The court erred in refusing to grant appellant the custody of her small and immature children.* Judge FLETCHER, in *O'Neal* v. *O'Neal,* 95 Miss. 415, 48 So. 624, expressed the sentiments which, we submit, should control in this case. The above decision lays down the general policy of the courts concerning children of tender age; and we submit, that at such ages the interest of these children will not suffer in the arms of their mother, though she eats only the bread of comparative poverty.

*W. M. Everett,* for appellee.

The first assignment of error is that the court erred in granting the appellee a divorce. The decree in this

case simply dissolves the matrimonial bonds existing between the complainant, G. C. Walker, and defendant, Mrs. Wincie Ann Walker, and says nothing with reference to which was granted the divorce.

This entire record details instance after instance of a long and continued and unbroken tragedy between two unpleasant and unhappy people, and if divorce was ever justified (and under the statutes of our state it certainly is) the present instant case is one in my humble judgment.

The appellant, through her attorneys, is now pleading for the first time as a main and only defense to this suit, that, the appellant during a part of the time of the desertion period of two years was placed by the chancery court under a ban of insanity. This plea was not even suggested to the chancellor in the court below.

Our friends, in quoting 19 C. J. 76, and *O'Neal* v. *O'Neal,* 95 Miss. 415, 48 So. 624, seem to rest consoled that the decision therein contained bears out their contention, but a close inspection thereof, it seems to me, if this is all their authority, puts the questions entirely beyond their hope of recovery. They rely wholly upon the fact that, the many acts of cruelty and inhuman treatment were committed by the appellant while under a ban of insanity.

We think there is no question that, independent of any lunacy proceedings, or the ban of insanity, the decree of the chancellor should be affirmed. If the period of desertion should fail, which we do not admit, the desertion should count as a part of the chain of cruel and inhuman acts against the complainant appellee.

Taking out and excluding all the acts complained of, during the last lunacy hearing, and certainly those before the first hearing, when she was declared sane, cannot here be charged against the appellee, the complainant, if any poor mortal ever was entitled to relief, is now entitled to it. 19 C. J. 76; *Hansel* v. *Hansel,* 3 Pa. Dist. 724, 15 Pa. 514.

The case of *Hiblet* v. *Bains,* 78 Miss. 706, 29 So. 80, lays down the doctrine of the best interest of the child, the only issue to be decided as to the custody of the child, and the mother to be preferred, if the child is very young. This rule was followed by the chancellor in the present case. The same rule was laid down, or rather followed, in *Duncan* v. *Duncan,* 119 Miss. 271, 80 So. 697.

The only authority cited, to uphold the contention of the appellant, to her right to claim the children, is the O'Neal case heretofore referred to, which, as already shown, does not apply to the present case at all.

Our contention is that the decree should stand, unmolested and unmodified and affirmed, as rendered by the court below, who knew the facts; as a finding by the chancellor, in an action for divorce, on conflicting evidence will not be disturbed on appeal, it not appearing manifestly wrong. See *Smithson* v. *Smithson,* 113 Miss. 146, 74 So. 149, L. R. A. 1917 D. 361 N.

McGOWEN, J., delivered the opinion of the court.

C. C. Walker filed his bill for divorce against his wife, Mrs. Wincie Ann Walker, alleged as grounds for divorce that the defendant deserted her home on the—day of June, 1921, and that the desertion constituted willful, continued, and obstinate desertion, for the space of and term of more than two years' time immediately before the filing of the bill.

Complainant further charged that the defendant was continually worrying and nagging at him, and refused to perform the regular and routine household duties, and had not been a real and true and affectionate wife for the past several years, and further charged that she had threatened to kill the complainant, and would go at times with two pocket knives concealed in her clothing, which he was advised and believed were carried for the purpose of carrying out her threats to kill him, and upon these statements charged defendant with habitually cruel

and inhuman treatment. Complainant further prayed for the custody of their six children.

Mrs. Walker filed her answer, specifically denying the desertion, denied nagging and worrying complainant, denied the allegations specifically of cruel and inhuman treatment, and charged complainant with being to blame, with having driven her from home; and she filed a cross-bill with her answer, charging the defendant with habitually cruel and inhuman treatment, specifying in many particulars. She further charged that, actuated by his desire to rid himself of her, he (the cross-defendant) had instituted insanity proceedings, hired skilled physicians and alienists, and sought to have her committed to an insane asylum, but that upon the first hearing she was adjudged sane; that in the early part of 1921 she became a victim of influenza, and that her husband, complainant, did not summon a physician. She stated, further, that in April she had received one thousand two hundred fifty dollars, and charged that her husband attempted to acquire this money from her, and that he instituted a second insanity proceeding against her; that instead, as claimed in the bill of cross-complainant, of willfully and obstinately absenting herself from him, she was in truth and in fact by order of the chancery court decreed to be insane and placed under the custody of her brother, John Stringfellow, as a result of her husband's wicked design to get rid of her and squander her estate. She charged him with habitually cruel and inhuman treatment, prayed for a divorce, alimony, permanent and *pendente lite,* and prayed that she be awarded the custody of the children, alleging her husband's unfitness therefor.

Cross-complainant filed his answer, denying any cruel acts or misconduct, or that he acted through any wicked design in seeking to have her declared insane.

The case was tried by the chancellor and resulted in his granting a divorce to the parties apparently in favor of the husband.

Mrs. Walker, in the course of the trial, through her attorneys announced that she had abandoned the divorce feature of her cross-bill, and would only stand on the cross-bill for the custody of her children and for alimony.

Mr. Walker testified that he never saw his wife with a knife, but saw the impression of it through her clothes, and that his wife had threatened to kill him. He testified to her ugly talk and the strongest statement for divorce in his testimony is the following:

"All along from the first up to ten, twelve, or fourteen years we had a pleasant life, then she got where she would rear up and treat me in all kinds of ways; she would talk ugly at me and abuse and threaten me; she would lock me out of the house, and I would stay out in the wagon body or the buggy all night, just to keep her quiet.

"Q. About how many times did that occur? A. Perhaps a dozen times, first and last. One time I was out three days and nights.

"Q. How many years did this continue? A. Up until she left. It had been occurring in the last two or three years."

The neighbors testified to unpleasant nagging and scolding on the wife's part. Their daughter testified to an occasion when her mother had left with all the children and had stayed away nearly a year, after which they returned home. She testified that her father was generally kind to her mother, and this from the record we quote:

"Q. Did you ever hear him curse and abuse your mother? A. She never spoke a kind word to him.

"Q. Do you remember hearing Mrs. Walker threaten Mr. Walker? A. She threatened a good deal, but she didn't do much of what she said she would do.

"Q. You do state that she was continually making threats against him? A. She would threaten him, but she didn't ever do them."

And in answer to the question as to whether her mother carried a knife or knives, the daughter replied that her mother did often carry a knife.

Much testimony was devoted to the question of alimony and the value of Mr. Walker's lands, which consisted of a country pine hill farm of small value. Mrs. Walker did not testify. The records as to the insanity proceedings offered in evidence disclosed that a decree confirming the chancery clerk's judgment upon verdict of a jury that Mrs. Walker was insane but not dangerous and should not be confined in an asylum, and that she was committed to the care of her brother, John Stringfellow, was entered on June 21, 1922. From the record we infer that the insanity trial before the chancery clerk and jury was held in the fall of 1921, and that Mrs. Walker appealed from that judgment to the chancery court, and the decree mentioned above was entered by the chancellor confirming the action of the clerk and jury.

On August 11, 1923, the same chancellor entered an order declaring Mrs. Walker had been restored to reason and discharged her from the custody of her brother, John Stringfellow. On August 18, 1923, the complainant, the husband, filed the bill in this case.

Mr. Walker also testified that his wife had remained under the disability of insanity for all of the proven statutory period save about two months; the court having evidently appointed Stringfellow to have custody of her person and Wells to be guardian of her property, as they were both discharged in the final insanity order. The record shows these were lunacy proceedings under our statute, initiated at the instance of the husband. In the record we find this testimony of Mr. Walker:

"Q. How long, Mr. Walker, have you been of the opinion that Mrs. Walker was insane? A. I don't know; a short time before I began investigating it.

"Q. How long ago was that? When did you first bring proceedings against her to have her declared in-

sane? A. About three years ago; it seems like it was about three years ago."

He also testified that his wife appeared to be in bad health.

It is assigned as error that defendant could not be held responsible for her conduct during the period in which she was declared and adjudicated to be insane.

Divorce is not a matter of right but is a matter of grace from the state, and in this case it clearly appears that Mrs. Walker was adjudicated insane, and that this adjudication was procured by her husband, who had alienists, Dr. Buchanan, Dr. Gilbert, and others, to make examination preliminary to the trial of the insanity proceedings, and that within one week after the court entered a decree adjudicating that she was restored to reason he filed his bill for divorce.

If the defendant is to be charged with responsibility for remaining away from her husband's bed and board from the time she was committed by the decree to the care of her brother, John Stringfellow, to-wit, from the date of the decree of the clerk, later confirmed by the chancellor on June 21, 1922, until August 11, 1923, then the bill in this case is sustained, and the decree granted by the chancellor dissolving the bonds of matrimony is proper.

In view of the conclusions we have reached, we think best to consider both grounds alleged for divorce together. Upon the charge of habitually cruel and inhuman treatment, the complainant, nor any of his witnesses, gave any date, and the only specific acts tending to prove cruelty have been set out by us *verbatim*. Conceding that the proof establishes habitually cruel treatment, which we do not say, was Mrs. Walker responsible for these acts which we have specified? And whether responsible or not, can a bill for divorce be maintained by one spouse against his consort who has been adjudicated by the courts to be insane?

After a careful study of this record, we have reached the conclusion that the decree of divorce in this case

should not be permitted to stand against the defendant, for the reason that, as to the desertion, the major portion of the time the defendant was, by decree of the chancery court, insane; therefore not capable during that period of willfully and obstinately doing an act. So far as we can glean from a close study of this record, in order to hold the defendant, Mrs. Walker, guilty of committing a matrimonial offense against her husband, we must count this period in which she was legally adjudged to be insane and legally deprived of the freedom of her movements by the courts of the land, in order to uphold a decree of divorce in this case. With this decree in the record, and with the testimony of the husband, we feel safe in holding that at least the burden of proof was upon the husband in this case to show that the acts complained of were the acts of a sane person.

Section 170, 19 Corpus Juris, p. 76, reads as follows: "The insanity of a spouse, if it existed at the time of the commission of a matrimonial offense, is a defense to an action for divorce, whether the offense is cruelty, abandonment, or desertion, nonsupport, or by the weight of authority, adultery, although there is some authority for the doctrine that the adultery of a wife is not excused by insanity. But a divorce may be obtained for acts happening prior to insanity, notwithstanding the subsequent insanity. Where, as in some states, voluntary separation for a specified period is a ground for divorce, the insanity of one of the spouses during the period of separation will preclude the granting of a divorce."

Under the notes to this section of Corpus Juris above set out we find that a court has held that the wife's adultery, even though committed while insane, would entitle the husband to a divorce, and the case of *Matchin v. Matchin,* 6 Pa. 332, 47 Am. Dec. 466, is cited; the author of Corpus Juris saying, with reference to this decision, at page 77, 19 Corpus Juris, note 24:

"(a) The reason given for this harsh and cruel doctrine, which seems confined to the jurisdiction in which it

originated, has been stated as follows: 'A wife's insanity, though so absolute as to have effaced from her mind the first lines of conjugal duty, would not be a defense to a libel for adultery, though it would be a defense to an indictment for it. . . . A libel for divorce is said to partake of the nature of a criminal proceeding; but the primary intent of it is undoubtedly to keep the sources of generation pure, and, when they have been corrupted, the preventive remedy is to be applied without regard to the moral responsibility of the subject of it.' *Matchin* v. *Matchin,* 6 Pa. 332, 47 Am. Dec. 446.''

This seems to be the only authority that has been called to our attention which authorizes the granting of a divorce to the offended spouse, where the matrimonial offense was committed during the insanity of the other, and the reasons, if sound, would not apply where the grounds for divorce are desertion and cruel treatment, as in the instant case.

In the case of *Cohn* v. *Cohn,* 85 Cal. 108, 24 P. 659, a decree of divorce was granted against the woman defendant and about a month thereafter she was judicially declared insane and thereafter placed in an insane asylum. Her guardian moved to set aside the judgment thus entered, and the California court said: ''It is plain that the acts of alleged cruelty were the result of a diseased mind on the part of the unfortunate woman, culminating in her insanity as above stated. We think she was also in the same condition at the date of the service of summons upon her. This being the state of facts, it seems to us that under the rule in divorce cases, laid down in *McBlain* v. *McBlain,* 77 Cal. 507 [20 P. 61], and *Wadsworth* v. *Wadsworth,* 81 Cal. 182 [22 P. 648, 15 Am. St. Rep. 38], the court below should have set the judgment aside, both upon grounds of public policy and as an act of justice in relieving an unfortunate lunatic of the stigma of 'inhuman cruelty' to her husband.''

In *John Broadstreet* v. *Lucinda Broadstreet,* 7 Mass. 474, decided in the year 1811, the plea of insanity as

against an admitted act of adultery was effectual to dismiss the bill.  We quote: "The libel charged adultery in the wife on a day certain, and prayed a divorce from the bonds of matrimony.  Wilde suggested to the court that the wife was insane at the time mentioned in the libel, and that she had continued so to this time; and, expressing some doubt as to the mode of his appearing in her behalf in the cause, the court said he should be admitted to plead in her name.  He pleaded that she was not guilty of the crime alleged; and the insanity being proved to the satisfaction of the court, the libel was dismissed.

"Mellen, for the libelant."

In the case of *Wray* v. *Wray,* 19 Ala. 522, that court held that adultery committed by the wife while insane was no ground for divorce on application of the husband, and referring to the case of *Matchin* v. *Matchin,* 6 Pa. 332, 47 Am. Dec. 466, *supra,* the court said: "But it was held in Pennsylvania that the wife's insanity at the time of her adultery was no bar to the husband's libel for a divorce. . . . 6 Pa. 332. . . . I cannot assent to the latter opinion, although it was delivered by Chief Justice GIBSON.  It is very true that a legitimate offspring is one great object of marriage, and that, if a sane woman act so as to disappoint her husband's object and expectations in this respect, he is entitled to a divorce.  In such case she is responsible for her acts and must abide their consequences.  If the reasoning of Mr. Chief Justice GIBSON had stopped there, no one could object to it.  But if we extend the principle upon which his opinion is chiefly founded to its necessary results, it will be found to be untenable, I think.  It would entitle the husband to a divorce, if the wife should become unfruitful from disease, or if another man should gain access to her by force or fraud.  In this case advantage was taken of her mental alienation, which can be the cause of no forfeiture of her rights, any more than if a similar advantage had been taken by means of a soporific or of actual force.  As in-

sanity itself is no cause for a divorce, nothing which is a consequence of it can be.''

In the case of *Kirkpatrick* v. *Kirkpatrick*, 81 Neb. 627, 116 N. W. 499, 16 L. R. A. (N. S.) 1071, 129 Am. St. Rep. 708, the court held that the wife's abandonment of the husband without just cause, and thereafter becoming insane, a cause of action for divorce did not accrue to the husband until the lapse of two years, exclusive of the time that she is insane. After reciting that at any time during the period the offending party had a right to repent and to offer to return, the court says:

'' 'For the two years the door of repentance and return must be kept open, and, if it is closed and barred when an offer to return is made in good faith, not only is the desertion terminated, but the circumstances may be such as to reverse the legal attitude of the parties, and constitute the party originally offended against, from that time forth, the offender.' . . . The statute does not contemplate that the act of abandonment alone shall be sufficient ground for divorce. It must be continued for a period of two years. The cause of action does not accrue until that time. If the one of sound mind is entitled to have the door of repentance held open to him for two years, we think that the same opportunity should be afforded to one who is mentally incompetent; and it cannot be said that she .is afforded such opportunity so long as her intellect is so clouded that she is incapable of forming the intent to return. A spouse who is insane cannot, under our statute, be guilty of conduct that will constitute a cause for divorce in favor of the other, for the reason that she is incapable of intentionally doing or committing an act that will constitute a ground for divorce. The ground for divorce did not exist in favor of the appellant in this case at the time that appellee became insane. The cause of action had not yet accrued to him. We are of the opinion that it could not accrue to him during her period of insanity. It follows that no part of the time during her insanity could be reckoned as a part of the two years'

abandonment necessary to constitute a cause or ground for divorce.''

In the case of *Baker* v. *Baker,* 82 Ind. 146, dealing with this question the court said: ''Insanity is no reason for dissolving the marriage. The statute does not make it one of the grounds for divorce, and surely no principle of justice or morality will justify the severance of the marital ties for any such cause. The judgment and conscience revolt at the thought that such a terrible affliction should be deemed cause for separating the wife from the husband. Divorces are granted not because of misfortune, but because of fault. It would be a barbarous code that would allow the wife to put aside the husband because stricken by such an awful calamity as the loss of reason.''

The divorce sought in the above-cited case was because the husband had failed to provide a support for his wife while insane.

In *Storrs* v. *Storrs,* 68 N. H. 118, 34 A. 672, the court said: ''Abandonment, to constitute a cause of divorce, must continue for three years together. . . . The time during which the defendant has been insane cannot be included in computing the statutory period. But for her insanity, it may be that she would have repented and returned to her husband.''

In the case of *Nichols* v. *Nichols,* 31 Vt. 328, 73 Am. Dec. 352, the court said, after holding with the trend of authorities above cited: ''We have read the case of *Matchin* v. *Matchin,* 6 Barr, 332, and the opinion of the late Chief Justice GIBSON where he attempts to maintain that the adultery of the wife, although insane, is sufficient ground for divorce, for the reason that it tends to impose a spurious offspring upon the husband. The reason is one which will have no application to similar acts committed by the husband, and as applied to the wife, seems truly revolting to all just sense of propriety and decency. We are surprised that such an opinion should ever have found admission into the reports, and should be shocked at the

prospect that it could ever gain general countenance in the American Republic.''

We might go on citing authorities from the various courts of this land to the effect that a divorce may not be obtained from an offending spouse if the acts complained of occur during insanity or during the period in which said offender has been judicially determined to be insane, where no effort is made to overturn the presumption raised by the adjudication in the lunacy proceedings. An adjudication of insanity raises the presumption that the lunatic is generally insane.

In the case at bar, the husband seeking the divorce from his wife fixes the time within the period, within which the offending wife was decreed to be insane, or so immediately before as to make it reasonably certain that the act was the result of insanity, and not an habitually cruel and inhuman act of a sane person, and likewise that it was not the willful and obstinate act of a sane person.

Conceding then that the facts set out constitute habitually cruel and inhuman treatment in view of the statements above, we must say that the court below erred in awarding a divorce in this cause.

The chancellor properly declined to recuse himself in this cause, not being shown to be related to the parties, nor financially interested in this litigation. See *Cashin* v. *Murphy* (Miss.), 103 So. 787.

As the prayer for the custody of the children in the bill and in the cross-bill, and for alimony, is dependent upon a decree of divorce which cannot be granted in this case, this cause is reversed, and the bill and cross-bill are dismissed here, and appellee is taxed with the costs.

*Reversed and dismissed.*